UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NATASHA L. BOYSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11-CV-02249 (CEJ) |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On April 1, 2009, plaintiff Natasha L. Boyster filed an application for a period of disability and disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et. seq.*, with an alleged onset date of January 5, 2009. (Tr. 123-131). After plaintiff's application was denied on initial consideration (Tr. 75-79), she requested a hearing from an Administrative Law Judge (ALJ). See Tr. 87-88 (acknowledging request for hearing).

Plaintiff and counsel appeared for a hearing on May 12, 2010 (Tr. 22-72). The ALJ issued a decision on July 26, 2010 denying plaintiff's application (Tr. 6-21), and the Appeals Council denied plaintiff's request for review on November 3, 2011. (Tr. 1-5). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report[1] (Tr. 159-168), plaintiff listed her disabling condition as "possible fibromyalgia." She stated that she is often forgetful and constantly tired and in pain. She asserted that she has difficulty ascending and descending stairs, carrying items, expressing thoughts, and suffers from migraines. Plaintiff stated that the pain in her shoulders and knees interfered with her ability to work a full week. Plaintiff listed her past employment positions as cashier, stocker, co-owner of a printing company, concession stand worker, deli worker, general laborer, home health aide, janitor, nurses aide, and phlebotomist. Plaintiff listed her medications as Ibuprofen, Lexapro,[2] and Prednisone.[3]

## B.  Hearing on June 8, 2010

At the time of the hearing, plaintiff was 33 years old, married, had a 22-month-old daughter, a 16-year-old daughter, and was expecting a third child in July 2010. (Tr. 26, 43). Plaintiff estimated her height as 5'6" and her weight as 232 pounds. Plaintiff completed up to the 11th grade and obtained a GED. (Tr. 27). She testified that she did not have any difficulty reading, as long as she was not suffering from a migraine, and that she could write and perform simple arithmetic, but struggled with spelling. (Tr. 28).

Plaintiff testified that she had been collecting unemployment benefits for over a year. She also stated that she had been looking for employment ever since her

---

[1] The record is void of a Function Report.

[2] Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder.    http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html  (last visited on Nov. 6, 2009).

[3] Prednisone is used to treat the symptoms of low corticosteroid levels. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html (last visited Nov. 6, 2012).

disability application was denied despite the fact that she believes she cannot work. (Tr. 29).

Plaintiff asserted that she suffers from Ehlers-Danlos Syndrome ("EDS")[4], fibromyalgia, polycystic ovarian syndrome, migraines that occur three to four times a week, depression, and sleep apnea. (Tr. 36, 39-41). Plaintiff stated that she has tried several different medications in order to treat the fibromyalgia but has been unable to continue them because of the side effects. (Tr. 37). Plaintiff also stated that her polycystic ovarian syndrome causes her ovaries to produce cysts each month that can sometimes enlarge to the size of a grapefruit, causing extreme pain and confinement to her bed. (Tr. 39).

Plaintiff testified that she receives help from her husband and mother in caring for her 22-month old daughter and going to the grocery store. (Tr. 43, 45). She further testified that she does laundry but rarely cooks and does not vacuum, wash dishes or perform any yard work. (Tr. 43- 44). Plaintiff asserted that because of her pain she cannot walk or sit for more than 15 minutes or stand for more than 6 minutes. (Tr. 45-46). Plaintiff stated that she does not lift her 24-pound daughter often because it hurts. (Tr. 46). The pain causes plaintiff to spend most of her days on the couch. Plaintiff described her pain as "electricity shooting down" her legs and "jackhammers" in her joints and that for 22 months prior to the hearing she did not have one day without any pain. (Tr. 50-51). She also testified to suffering from dizzy spells that occur at least once a week and usually last for the entire day. (Tr. 52). She asserted that she

---

[4]Ehlers-Danlos Syndrome is a group of inherited disorders marked by extremely loose joints, hyperelastic skin that bruises easily, and easily damaged blood vessels. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002439/ (last visited Nov. 13, 2012).

would have difficulty concentrating at work and would likely be absent two or three times per week. (Tr. 54).

Plaintiff's husband, Rick Boyster, testified as a witness at the hearing. (Tr. 55-65). Mr. Boyster stated that plaintiff cooks occasionally, but not as often as she used to, and that when she does cook she tends to prepare food in bulk so that it can be reheated for several days. (Tr. 57, 62-63). Mr. Boyster testified that he typically does his own laundry and sometimes helps plaintiff with hers. He also confirmed that plaintiff can drive and that she suffers from headaches two or three times a week. (Tr. 58-59). Mr. Boyster testified that activities such as grocery shopping can cause plaintiff severe pain the following day, that plaintiff is generally fatigued, unable to lift things, and has difficulty focusing because of her pain. (Tr. 61).

Delores E. Gonzalez, M.Ed., a vocational expert, provided testimony regarding plaintiff's past work and current employment opportunities. (Tr. 65-71). The ALJ asked Ms. Gonzalez to list plaintiff's vocational history and classify each position. Ms. Gonzalez listed cashier and phlebotomist as light, semi-skilled work; convenient store clerk as light, unskilled work; small business owner as light, skilled work; concession vendor, deli worker, and assembler as medium, unskilled work; home health aide as medium, semi-skilled work; and janitor as heavy, unskilled work. (Tr. 67-68).

The ALJ asked about the employment opportunities for an individual with limited education, training, work experience, and time, with the ability to perform light work which involves climbing stairs and/or ramps occasionally, stooping, kneeling, or crouching occasionally, and who must avoid climbing ropes, ladders, scaffolds, or crawling. (Tr. 68-69). Ms. Gonzalez testified that such an individual would be able to

-4-

perform the positions of cashier, convenience store clerk, small business owner, and phlebotomist. (Tr. 69).

The ALJ then asked about the employment opportunities for an individual with the same skills and limitations as in the prior hypothetical but with an added "sit/stand option at the worksite with the ability to change positions frequently." Ms. Gonzalez opined that such an individual would still be able to perform the cashier position but not in the same way as plaintiff had performed it in her past employment, the small business owner position, and the phlebotomist position. (Tr. 69-70). Ms. Gonzalez classified the cashier position as light, unskilled work of which there are 81,800 jobs within the state of Missouri (34,850 in the St. Louis metropolitan area). (Tr. 69).

The ALJ then asked about the employment opportunities for an individual with the same skills as in the original hypothetical but who had a sedentary limitation. Ms. Gonzalez testified that the individual could perform as a surveillance system monitor of which there are 2,020 jobs within the state of Missouri (700 in the St. Louis metropolitan area) and information clerk of which there are 17,640 jobs within the state of Missouri (9,990 in the St. Louis metropolitan area). (Tr. 70).

The ALJ concluded by asking whether an individual whose migraine headaches and fatigue would cause up to three absences per month would still be able to perform as a surveillance system monitor or information clerk. (Tr. 70). Ms. Gonzalez testified that the hypothetical individual would not be able to perform those jobs or any others in the national economy. (Tr. 71).

The plaintiff's attorney then asked whether there would be any jobs available for an individual who would need to sleep or rest in a reclined position for two to three

hours out of an eight-hour work day. Ms. Gonzalez opined that there would not but any jobs available to an individual with that limitation. (Tr. 71).

### C. Medical Evidence

On September 11, 2008, plaintiff visited Shaukat A. Thanawalla, M.D., with complaints of joint aches. Treatment notes list plaintiff's diagnosis as diabetes mellitus, myalgia,[5] and myositis.[6] (Tr. 224-25). On February 24, 2009, plaintiff returned to Dr. Thanawalla with continued complaints of joint pain mainly in her knees bilaterally and generalized pain. She also complained of blurred vision, complete loss of vision that can last up to four hours, nausea, vomiting, and poor equilibrium. Treatment notes list plaintiff's diagnosis as migraines with aura,[7] myalgia, and myositis. (Tr. 217-218). Dr. Thanawalla referred plaintiff to rheumatologist Sandra S. Hoffman, M.D.

On March 23, 2009, Dr. Hoffman wrote that plaintiff had no deformity or swelling of joints but was tender across the hands, wrists, elbows, shoulders, neck, upper back, and T-spine; was somewhat hypermobile; and had normal C-spine, L-spine, and pelvis x-ray results. Dr. Hoffman further wrote that she was suspicious that plaintiff suffered from fibromyalgia,[8] but wanted to exclude other ailments first. (Tr. 259-262).

---

[5] Myalgia is an alternative medical term for "muscle pain." http://www.nlm.nih.gov/medlineplus/ency/article/003178.htm (last visited Nov. 9, 2012).

[6] Myositis is the medical term used to describe the inflammation of skeletal muscles. http://www.nlm.nih.gov/medlineplus/myositis.html (last visited Nov. 9, 2012).

[7] The phrase "with aura" indicates visual symptoms that a migraine sufferer may experience shortly before the headache begins. Symptoms of aura include blind spots, zigzag patterns, flashing lights, and hallucinations. http://www.webmd.com/migraines-headaches/what-is-a-migraine-with-aura (last visited Nov. 9, 2012).

[8] Fibromyalgia is a chronic pain disorder characterized by widespread pain, multiple tender points, abnormal pain processing, sleep disturbances, fatigue and often

On April 6, 2009, plaintiff underwent an electrodiagnostic study. Jamie Haas, M.D., reported that the examined muscles did not show evidence of electrical instability, all nerve conduction studies and F wave latencies were within normal limits, and there was no evidence of carpal tunnel syndrome, radiculopathy, or other entrapment neuropathy of the bilateral upper and lower extremities. (Tr. 266-69). On April 13, 2009, plaintiff underwent a whole body bone scan that also reflected normal results. (Tr. 369). On May 17, 2009, plaintiff participated in a polysomnographic study, which reflected mild obstructive sleep apnea syndrome. Dr. Haas ordered CPAP treatment for the sleep apnea.[9] (Tr. 297).

On May 18, 2009, plaintiff underwent a physical residual functional capacity ("RFC") assessment. The report states that plaintiff can occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand, walk or sit for about a total of about 6 hours in an 8-hour workday; frequently climb ramps, stairs, ladders, ropes, scaffolds; stoop, kneel, crouch, crawl; and occasionally balance. (Tr. 287-93).

On May 18, 2009, plaintiff returned to Dr. Hoffman with complaints of dizziness and chronic pain. Dr. Hoffman ordered plaintiff to have an MRI in order to rule out multiple sclerosis. (Tr. 348). The MRI of plaintiff's brain showed a small focus of linear

---

psychological distress. Currently there are no laboratory tests available for diagnosing fibromyalgia. Doctors must rely on patient histories, self-reported symptoms, a physical examination, and an accurate manual tender point examination. http://fmaware.org/site/PageServerded3.html?pagename=fibromyalgia (last visited Nov. 9, 2012).

[9] CPAP, or continuous positive airway pressure, is a treatment that uses mild air pressure to keep the airways open. CPAP can be used to treat sleep apnea. http://www.nhlbi.nih.gov/health/health-topics/topics/cpap/ (last visited Nov. 13, 2012).

signal abnormality in the right temporal lobe subcortical white matter, likely representing a small venous angioma, but otherwise the scan was negative. (Tr. 356).

On May 29, 2009, plaintiff visited with James W. McIlwaine, M.D., regarding her sleep apnea. Dr. McIlwaine ordered that plaintiff continue the CPAP treatment, discussed surgical options, and recommended weight loss. (Tr. 313-14). On June 29, 2009, plaintiff saw Dr. Haas who wrote that plaintiff was intolerant of the CPAP in that she "rips the mask off while asleep" and that plaintiff wanted surgery. (Tr. 294). On July 20, 2009, plaintiff saw Dr. Hoffman who described plaintiff's fibromyalgia as severe and indicated that plaintiff was "not functional due to memory deficits, global fatigue and pain." Dr. Hoffman also noted plaintiff's intolerance to the CPAP. (Tr. 347).

In an attempt to treat the sleep apnea, plaintiff underwent nasal septal reconstruction, turbinate reduction surgery, and a tonsillectomy. On August 4, 2009, plaintiff saw Dr. McIlwaine for a follow-up and reported that she was doing relatively well despite having some moderate to severe pain. (Tr. 312). On August 31, 2009, plaintiff returned to Dr. McIlwaine for a second follow-up and reported that she was doing much better than the prior visit. Plaintiff's husband told Dr. McIlwaine that plaintiff was sleeping much more soundly and not experiencing any disturbed sleeping patterns. (Tr. 311).

On November 23, 2009, plaintiff visited Dr. Hoffman and expressed that she felt as if she was getting worse. Plaintiff reported having incapacitating migraines that last up to two days and pain from her waist to her feet. Dr. Hoffman wrote that plaintiff did not appear as if she was able to function. (Tr. 345).

On February 1, 2010, plaintiff visited Metropolitan Neurology for a neurological consultation.  Venkat K.C. Rao, M.D., wrote in his treatment notes that plaintiff

suffered from multiple pain symptoms, that paresthesias could be secondary to fibromyalgia, but that the differential could also include possible bilateral meralgia paresthetica, with or without possible lumbar stenosis and radiculopathy. Dr. Rao also included in his diagnoses right occipital neuritis. Treatment was limited at the time due to plaintiff's pregnancy. (Tr. 315-25).

On February 22, 2010, plaintiff sas Dr. Hoffman for a follow-up relating to her fibromyalgia. Dr. Hoffman noted that plaintiff was also suffering from gestational diabetes, polycystic ovary disease, and depression. (Tr. 343). Dr. Hoffman wrote a letter to plaintiff's attorney expressing her opinion that the plaintiff was fully disabled due to clinical depression, chronic pain related to her fibromyalgia, and chronic fatigue. (Tr. 326).

On May 4, 2010, plaintiff went to Washington University Medical Center for an evaluation of whether she suffered from type III or type IV EDS. Based on a clinical evaluation and a review of plaintiff's family history, Alison J. Whelan, M.D., diagnosed plaintiff with EDS III of which chronic joint pain is a serious complication of the illness. (Tr. 375-76).

On May 16, 2010, Dr. Thanawalla completed a medical source statement for plaintiff's social security disability application. Dr. Thanawalla reported that plaintiff can occasionally lift or carry up to 10 pounds; stand or walk for no more than 30 minutes at one time without interruption; sit, stand, or walk for no more than one hour in an eight hour work day; and occasionally reach, handle items, push or pull, climb stairs and ramps, balance, stoop, kneel, crouch, crawl, but not climb ladders or scaffolds. The report stated that the plaintiff would be unable to perform any significant work. (Tr. 379-384).

On August 23, 2010, Dr. Hoffman authored another letter expressing her opinion that plaintiff should receive full disability because of her medical inability to work for even a few hours a day as a result of the pain caused by fibromyalgia and EDS. Dr. Hoffman wrote that physical therapy and massage only exacerbated the pain. (Tr. 400-401). On August 27, 2010, plaintiff's chiropractor of five years, Dr. Jeffery Ness, authored a letter describing EDS as a non-curable disease that "will only get worse and will eventually force [plaintiff] into a non-weight bearing position for the rest of her life" and "which will be accelerated if she continues to work in [] a classic work place facility." (Tr. 394). On November 22, 2010, treatment notes once again reflect Dr. Hoffman's belief of plaintiff's inability to function due to her chronic global pain. (Tr. 181).

On February 28, 2011, plaintiff underwent an MRI of the brain, cervical spine, and lumbar spine. The results show mild posterior disc bulges at C4-5 and C5-6, L2-3 mild posterior annular disc bulge without spinal canal stenosis, L5-S1 mild facet degenerative arthropathy, no evidence of spondylolysis, mild right maxillary sinus disease, no cerebral edema or mass effect, no acute infarct, and low lying cerebellar tonsils. (Tr. 389-91).

On March 16, 2011, Dr. Ness wrote a letter in response to plaintiff's request for a written update regarding her symptoms. Dr. Ness stated that two weeks prior to writing the letter plaintiff had an acute episode of her left wrist chronically dislocating which he attributed to EDS. Dr. Ness explained that plaintiff's wrist was splinted with a carpal tunnel brace, but that her wrist remained unstable. (Tr. 441).

On May 2, 2011, Jacques S. Van Ryn, M.D., wrote a letter to Dr. Hoffman expressing that plaintiff's pain was controlled with OxyContin, that plaintiff had multiple

areas of tenderness, that the lumbar MRI reflected very mild degenerative disc disease, that the cervical spine MRI showed minor cervical degenerative disc disease, and that the brain MRI was negative. Dr. Van Ryn wrote that he did not believe that plaintiff had multiple sclerosis and that the intermittent numbness and weakness were due to repetitive injury to hyperextensible joints. Dr. Van Ryn advised plaintiff to exercise and lose weight. (Tr. 396-97).

On May 23, 2011, plaintiff visited Dr. Van Ryn for a follow-up appointment. Dr. Van Ryn reported that plaintiff was doing "fair at best, still quite a bit of shoulder pain" despite doing her exercises about three times per week. Treatment notes list EDS, multi-directional instability of the shoulders, patellar instability, and bilateral instability as plaintiff's diagnoses. (Tr. 409). On July 18, 2011, plaintiff returned to Dr. Van Ryn who suggested that plaintiff undergo a ligamentous operation due to her right ankle instability and sacroiliac dysfunction. Dr. Van Ryn also noted mild elbow instability and some radial tunnel syndrome. (Tr. 445). On August 25, 2011, plaintiff underwent right ankle reconstruction surgery. (Tr. 449).

### III. The ALJ's Decision

In the decision issued on July 26, 2010, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013.

2. Plaintiff has not engaged in substantial gainful activity since January 5, 2009, the earliest alleged onset date.

3. Plaintiff has the following severe impairments: headaches and fibromyalgia.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

-11-

5. Plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) except that plaintiff can only occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, and crouch; and never crawl.

6. Plaintiff is capable of performing past relevant work as a cashier, convenience store clerk, small business owner - printing, and phlebotomist as she performed these jobs. This work does not require the performance of work-related activities precluded by the plaintiff's residual functional capacity.

7. Plaintiff has not been under a disability, as defined in the Social Security Act, from January 5, 2009, through the date of this decision.

(Tr. 6-21).

## IV. Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D),

(d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3)

the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

-14-

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.  Discussion

Plaintiff argues that the ALJ erred in his credibility determinations regarding herself and her treating physicians, in failing to take into account the ongoing and progressive nature of EDS, and in improperly using plaintiff's application for unemployment benefits against her in his decision. (Doc. #10).

### 1.  Treating Physicians' Opinions

In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record.  20 C.F.R. § 404.1527(b). The opinion of a treating source may be given controlling weight where it is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with the record as a whole.  20 C.F.R. § 404.1527(c)(2).  However, the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment."  Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998) (internal quotations and citations omitted).

Here, plaintiff's rheumatologist, Dr. Hoffman, and her primary care physician, Dr. Thanawalla, both opined that plaintiff's condition precluded work. (Tr. 181, 379-384, 401-401).   The ALJ properly declined to adopt their opinion with respect to plaintiff's capacity to work, as this is an issue that is reserved to the Commissioner.

However, the Court finds that the ALJ failed to give proper weight to the medical observations of Dr. Hoffman, the treating physician who ultimately diagnosed plaintiff's chronic pain as fibromyalgia. "When an ALJ discounts a treating physician's opinion, he

should give good reasons for doing so." Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007); 20 C.F.R. § 404.1527(d)(2).

When the ALJ assigned "only some evidentiary weight to Dr. Hoffman's opinions," he addressed the possibility that Dr. Hoffman supported plaintiff's disability because she sympathized with plaintiff's pain or because plaintiff demanded a report supportive of her disability application. The ALJ then stated that "[w]hile it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case." (Tr. 14). While it is true that a treating physician's opinion is entitled to less weight when contrary to medical evidence as a whole, the ALJ did not specify what these inconsistencies were and none are apparent to the Court. If the ALJ is referring to plaintiff's normal EMG, nerve conduction studies, or MRI results, it is well-established that fibromyalgia cannot be diagnosed through usual laboratory or radiological tests.[10]

It is also worth noting that in weighing the importance of Dr. Hoffman's medical opinion, the ALJ seemed to find problematic the fact that Dr. Hoffman did not explain why plaintiff could not tolerate the CPAP treatment for her sleep apnea. (Tr. 14). However, the record is clear that on June 29, 2009, Dr. Jamie Haas, the treating physician for plaintiff's sleep apnea, explained that plaintiff was not tolerating the machine because she would rip the mask off while asleep. (Tr. 294). Accordingly, Dr.

---

[10] Fibromyalgia cannot be diagnosed through laboratory tests or x-rays. Doctors must rely on patient histories, self-reported symptoms, a physical examination, and an accurate manual tender point examination. See http://www.fmaware.org (last visited Nov. 15, 2012).

Hoffman's opinion merits further consideration and if inconsistencies are present they should be identified.

## 2. **Plaintiff's Allegations of Pain**

In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit articulated five factors for evaluating pain and other subjective complaints: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions." "The ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting [a claimant's] subjective complaints." Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011). The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). The ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the Court will usually defer to the ALJ. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).

The ALJ determined that plaintiff's allegations of disabling pain were not fully credible. In doing so, he found that plaintiff's "allegedly limited daily activities [could not] be objectively verified with any reasonable degree of certainty" and plaintiff's limitations could not be adequately attributed to her medical condition because of "the relatively weak medical evidence." (Tr. 16).

The Court finds problematic the ALJ's statement regarding his inability to objectively verify plaintiff's limited daily activities. Under Polaski, the ALJ is to consider

a claimant's daily activities. To determine whether the activities indicate a disability, the ALJ is charged with determining whether the claimant is credible, not whether the activities are verifiable. Cavins v. Astrue, 4:06-CV-1543 (E.D.Mo. June 30, 2008); Adkins v. Astrue, No. 7:06-CV-132-D(2), 2008 WL 4320719, at *6 n.1 (E.D.N.C. Dec. 6, 2007). An ALJ should not reject subjective complaints of pain because they cannot be objectively verified. Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007).

The Court also takes issue with the ALJ's statement that it was "difficult to attribute [plaintiff's] degree of limitation to [her] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence[.]" A claimant's limitation which is self-imposed, rather than a medical necessity, is a basis upon which an ALJ may discredit a claimant's alleged limitation. See Blakeman v. Astrue, 509 F.3d 878, 882 (8th Cir. 2007) ("The issue is not whether [the claimant] was credible in testifying that he naps each weekday afternoon he is not working. The issue is whether his heart condition compels him to nap each afternoon."); Brunston v. Shalala, 945 F. Supp. 198, 202 (W.D. Mo. 1996) ("Plaintiff also testified that she spent part of the day lying down; however, no physician stated that such a need existed."). The record includes Dr. Hoffman's opinion that plaintiff could not work an eight-hour day five days a week or work a few hours a day because of the pain that would be produced from working even low impact jobs. (Tr. 400). The record also reflects that Dr. Ness was of the opinion that this is a "clear case of a 'chronic debilitating disease' which will be accelerated if she continues to work in [a] classic work place facility." (Tr. 394). The frequency with which plaintiff saw her rheumatologist, underwent diagnostic tests, her history of taking narcotic pain medication, and her most recent joint surgery is the antithesis of "weak medical evidence" of chronic pain. See Tr. 404 (listing plaintiff's

medications, including Perocet and Oxycontin). It is also worth noting that no treatment provider ever opined that plaintiff was a malingerer, made exaggerated complaints of pain, or was forceful in her requests for letters in support of her disability.

The ALJ referred to Dr. Whelan's statement that physical therapy was generally recommended for individuals with EDS who were experiencing joint pain. The ALJ noted the "record of evidence does not reveal any physical therapy sessions involving the claimant." Although the record is void of any treatment notes or documentation from a physical therapist, Dr. Hoffman acknowledged in treatment notes that plaintiff did participate in physical therapy. On August 23, 2010, Dr. Hoffman wrote that "[p]laintiff has tried physical therapy but could not perform it as it was quite painful to her. Her hypermobility tends to cause damage when she does the exercises outlined and her hyperalgesia makes massage and other such manipulations painful." (Tr. 400). Furthermore, Dr. Van Ryn wrote that plaintiff's shoulder pain persisted despite the fact that she performed her exercises three times a week. (Tr. 409).

Because the ALJ's credibility findings are not supported by substantial evidence on the record as a whole, remand is required for reconsideration of plaintiff's claims of disabling pain.

### 3. Consideration of Ehlers-Danlos Syndrome

Plaintiff's contention that the ALJ did not consider EDS is not supported by the record. Although plaintiff did not list EDS in her Disability Report, the record reflects that the ALJ did consider the nature of EDS in reaching his decision. The ALJ acknowledged that Dr. Whelan performed a physical examination of plaintiff which revealed hypermobility in both large and small joints and that she diagnosed plaintiff

with EDS. The ALJ further included Dr. Whelan's description of the syndrome by mentioning that affected individuals could have joint hypermobility, soft skin with normal or only slightly increased extensibility, chronic joint and back pain, recurrent joint dislocations, or subluxations, and functional bowel disorder. The ALJ further acknowledged that chronic pain, distinct from that associated with acute dislocations and advanced osteoarthritis, was a serious complication of the condition. (Tr. 14-15).

### 4. Plaintiff's Application for Unemployment Benefits

Plaintiff testified that for over a year prior to the hearing she was collecting unemployment benefits, which required her to affirmatively state that she was able and willing to work. An application for unemployment compensation is "some evidence, though not conclusive, to negate" a claim of disability. Johnson v. Chater, 108 F.3d 178, 180-81 (8th Cir. 1997). On remand, the significance of plaintiff's application for unemployment benefits should be reassessed as part of the overall re-examination of plaintiff's credibility.

### VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole. Therefore, the decision will be reversed and the case remanded for further proceedings. A separate judgment will accompany this Memorandum.

Carol E. Jackson

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 14th day of January, 2013.